# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **AIPSO** | ) |
| | ) |
| **Plaintiff** | ) |
| **v.** | ) |
| | ) **JURY DEMAND** |
| **SEDGWICK CLAIMS MANAGEMENT** | ) |
| **SERVICES, INC.** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## <u>COMPLAINT</u>

Plaintiff, AIPSO, by and through its undersigned counsel, Saul Ewing LLP, alleges the following claims against Defendant, Sedgwick Claims Management Services, Inc., ("Sedgwick") for damages and in support thereof states as follows:

### INTRODUCTION

1. This lawsuit stems from Sedgwick's negligent and reckless handling of certain insurance claims, which has cost AIPSO over $18.5 million in damages.

2. Sedgwick's actions in handling claims arising out of an accident that caused the deaths of three innocent persons breached its claims administration contract with AIPSO and constituted negligence and willful misconduct, leaving AIPSO to clean up the mess Sedgwick created by: (i) failing to timely respond to a tender of defense; (ii) not assigning defense counsel to represent all insureds on the policy in question; (iii) permitting defaults to be entered against the insureds in litigation; (iv) agreeing to pay the policy limits to secure the release of only one of the insureds without protecting the other insureds; and (v) exposing AIPSO's remaining insureds to verdicts well in excess of their liability insurance.

1

3. Pursuant to the claims administration contract Sedgwick entered into with AIPSO, Sedgwick was contractually obligated to administer claims by timely responding to a tender of defense, promptly appointing defense counsel for all insureds, and using reasonable efforts to ensure that claims against the insured parties could be fully resolved within the insurance policy limits.

4. Instead, in this case, Sedgwick failed to even respond to a tender of defense, unduly delayed in appointing defense counsel for all insureds, and exhausted the policy limits to settle claims for just one of four insured parties, leaving the remaining three insureds at grave risk of a judgments being entered against them for tens of millions of dollars in excess of their insurance policy limits and/or being forced to file for bankruptcy.

5. Sedgwick's negligent and reckless actions – which are in breach of its contractual duties – forced AIPSO to incur attorney's fees and costs and to pay out over $18.5 million in excess of the insurance policy limits in order to protect its insureds from almost certain liability and massive damage awards in connection with three wrongful death lawsuits filed in Nevada.

6. Based on Section 7(A) of the Service Agreement for Administration of a Claims Program ("Agreement") between Sedgwick and AIPSO, Sedgwick is contractually obligated to indemnify, hold harmless, and defend AIPSO for any and all costs, liabilities, losses, and damages as a result of Sedgwick's negligence or willful misconduct in connection with its performance as AIPSO's third-party claims administrator for these claims. The Agreement is attached hereto as Exhibit 1.

**PARTIES**

7. AIPSO is a non-profit organization that is the service provider of choice for various groups responsible for administering to the insurance industry's residual markets. AIPSO's

principal place of business is located at 302 Central Avenue, Johnston, Rhode Island, 02919. Many of AIPSO's services are provided directly to or on behalf of Governing Committees representing the insurance residual market mechanisms of each state.  AIPSO, on behalf of the automobile insurance industry, aims to ensure stability in the already unruly and high stakes automobile residual market, while focusing on its customers' needs to meet local and state residual market requirements.

8.      Sedgwick is a third-party claims administrator, incorporated in the State of Illinois with its principal place of business located at 8125 Sedgwick Way, 4th Floor Legal Department, Memphis, Tennessee, 38125. Sedgwick handles claims that include, but are not limited to, workers compensation, property claims, complex commercial claims, and personal injuries stemming from commercial automobile accidents.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 because there is completely diversity of citizenship between the parties as AIPSO is a citizen of Rhode Island and Sedgwick is a citizen of Illinois and Tennessee.  The amount in controversy has damages that exceed the sum of $75,000, exclusive of interest and costs.

10.      This Court has personal jurisdiction over Sedgwick because Sedgwick transacts substantial business and maintains a physical presence in Tennessee, and because Sedgwick expressly agreed in Section 12 of the Agreement to submit to the jurisdiction of the courts in the State of Tennessee.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Sedgwick conducts substantial business in this judicial district, and Sedgwick agreed in Section 12 of the

3

Agreement that all disputes between it and AIPSO must be resolved in a court located in the State of Tennessee.

**FACTUAL ALLEGATIONS**

**A. Sedgwick's Obligations as a Third-Party Claims Administrator**

12. For over fifty years, AIPSO – a non-profit, management organization serving the automobile insurance industry – has been the service provider for state mandated automobile insurance plans that administer the residual market in various states. The residual market is comprised of insureds who are unable to purchase automobile insurance through the voluntary market. AIPSO provides many services including accepting applications, arranging for coverage, policy processing, claims-handling, and taking steps to ensure that the residual markets plans are not exposed to extra-contractual exposure on mishandled claims.

13. AIPSO uses third-party claims administrators like Sedgwick to administer claims that arise under the policies AIPSO issues.

14. As such, on or around June 24, 2022, AIPSO and Sedgwick entered into the Agreement. *See generally* Ex. 1.

15. According to Section 12 of the Agreement, the terms and conditions of the Agreement are governed by the laws of the State of Tennessee without regard to conflicts of law principles.

16. According to Section 12 of the Agreement, the Parties agreed and stipulated to litigate in the State of Tennessee if a dispute arose under the Agreement.

17. According to Section 12 of the Agreement, in the event of litigation, the prevailing party may, in addition to other relief obtained, recover its court costs and reasonable attorney's fees.

4

18. Under the Agreement, Sedgwick – as AIPSO's third-party, claims administrator – must review all qualified claims and loss reports received from AIPSO and process claims under all applicable statutory and administrative regulations as well as Sedgwick's own claims administration standards and AIPSO's claims guidelines. *See* Ex. 1 § 1(A)(2).[1]

19. Further, under the Agreement, Sedgwick is obligated to investigate each claim made and settle each claim if it would be prudent for AIPSO to do so and so long as the settlement amounts do not exceed the insurance policy limits. *Id.* § 1(A)(1).

20. Sedgwick is also obligated to assign defense counsel and notify AIPSO of any claims where its potential liability could exceed the applicable policy's limits. *Id.* § 1(A)(7)-(8).

21. In the event that Sedgwick fails to exercise reasonable care in its performance of its duties under the Agreement and AIPSO suffers any loss as a result, Sedgwick has agreed to fully indemnify, hold harmless, and defend AIPSO under Section 7(A) of the Agreement:

> Sedgwick shall be fully responsible for exercising reasonable care at all times in the performance of its obligations hereunder…**Sedgwick agrees to indemnify, hold harmless and defend Client**, its directors, officers, employees, and agents from and **against any and all liabilities, loss, or damage that they may suffer as a result of any claim, demand, cost, or judgment against them arising out of the negligence or willful misconduct of Sedgwick in connection with its performance under [the] Agreement**, provided that such acts or omissions do not arise out of or relate to oral or written instruction, procedures or forms supplied by Client or to Client's internal management or adjustment of its claims.

*Id.* § 7(A) (emphasis added in bold).

---

[1] The section symbol refers to the paragraphs following the heading "AGREEMENT" in the Service Agreement.

### B. Sedgwick's Commercial Auto Service Expectations

22. The Agreement also requires Sedgwick to comply with its own Auto Service Expectations Manual ("Sedgwick's Guidelines"). *Id.* at § 1(A)(1). Sedgwick's Guidelines are attached hereto as Exhibit 2.

23. Therefore, Sedgwick's Guidelines were incorporated into the Agreement when the parties' relationship began. *See* Ex. 1 § 1(A)(1); Ex. 2.

24. Sedgwick's Guidelines require, among other things, that Sedgwick establish an action plan in order to administer each claim by verifying coverage and conducting an ongoing review of said action plan throughout the life of the claim. Ex. 2, p. 3. This ongoing plan must be reviewed every ninety (90) calendar days and include a detailed strategy in Sedgwick's files that outlines goals to dispose of the claim and develop strategies and a timeline to meet said goals. *Id.* Sedgwick is also required to complete its investigation of a qualified claim, conduct a detailed evaluation of all possible damages, and make a liability determination. *Id.* at p. 10.

25. After the claim is reported, Sedgwick must make initial contact with AIPSO, the claimant, as well as witnesses by the end of the next business day. *Id.* at p. 9. Within five (5) days of having a claim reported, Sedgwick's Guidelines requires it to evaluate and determine coverage issues. *Id.*

26. If a claim proceeds to litigation, Sedgwick's action plan must consist of timely reviewing a summons and timely answering the complaint. *Id.* at p. 4. Specifically, if a suit is filed, Sedgwick's guidelines specifically require it to:

> a. Review all legal documents with the claims team, client, and carrier as necessary;
>
> b. Obtain approval from AIPSO prior to pursuit of litigation or settlement;

6

c. Develop a mutually agreed upon action plan with AIPSO and obtain a legal budget;

d. Monitor and manage all legal activity until resolution or settlement; and

e. Assign defense and manage assigned counsel.

*Id.* at p. 12. This is to ensure "an effective partnership with [the assigned defense counsel and]…to provide high quality and efficient representation during the litigation." *Id.*

### C. AIPSO's Claim Guidelines

27. The Agreement also requires Sedgwick to comply with AIPSO's Insurance Operations Claims Guidelines Manual ("AIPSO's Guidelines"). Ex. 1 at § 1(A)(1). AIPSO's Guidelines are attached hereto as Exhibit 3.

28. Therefore, AIPSO's Guidelines were incorporated into the Agreement when the parties' relationship began. Ex. 1 § 1(A)(1). *See generally* Ex. 3.

29. AIPSO's Guidelines require third-party claims administrators ("TPA") like Sedgwick to adhere to "industry standards, [and the TPA's] best practices." *Id.* at p. 3. This includes immediately informing AIPSO about qualified claims that involve serious injury, including fatalities, or property damage. *Id.* AIPSO's Guidelines require that the TPA must contact AIPSO and all parties to the qualified claim within 24-48 business hours of receipt of the qualified claim. *Id.* at p. 5.

30. In the case of Sedgwick, AIPSO has adopted Sedgwick's claim management form as the primary means of reporting coverage between AIPSO and Sedgwick. Sedgwick must complete the claims management form and submit it to AIPSO within thirty (30) days on claims that involve serious injuries, including fatalities.

7

31. AIPSO's Guidelines also requires that any "[u]nresolved coverage issues shall be immediately communicated to" AIPSO such that the TPA can establish reserves in accordance with industry standards. *Id.* at pp. 4, 7.

32. Further, AIPSO will provide direction and authority to the TPA on all settlement offers that exceed the TPA's authority. *Id.* at pp. 9.

**D.      The Insurance Policy between NSIC and Pan American Cargo, LLC**

33. AIPSO serves as the designated service provider for the State of Ohio's commercial automobile insurance residual market. AIPSO is the general agent for National Specialty Insurance Company ("NSIC") in connection with commercial automobile policies issued on behalf of the Ohio Automobile Insurance Plan ("OHAIP").

34. On or around June 1, 2023, AIPSO – as the contracted service provider for the OHAIP and on behalf of NSIC – issued a commercial automobile liability insurance policy with a policy limit of $1,000,000.00 per accident to an Ohio-based insured named Pan American Cargo LLC ("Pan  American") (collectively, the "Policy").

35. The Policy was effective from June 27, 2023, through June 26, 2024.

36. Under the Agreement, Sedgwick served as the TPA for all NSIC commercial automobile liability claims, including but not limited to any and all qualified claims that arose under the Policy.

**E.      The Accident**

37. Pan American and Sage Freight, LLC ("Sage") entered into a carrier-broker agreement. As part of Pan American and Sage's carrier broker agreement, Sage was as a qualified, additional insured on the Policy.

8

38. Pan American then contracted Runa Transportation ("Runa") to carry and transport its freight. Runa was also a qualified, additional insured on the Policy.

39. On or around March 23, 2024, Kembry Gebo ("Gebo"), Athena Taylor ("Taylor"), and Owen Hart ("Hart") (collectively, "Nevada Plaintiffs") were struck and killed by Claude Rafiki ("Rafiki") in a tragic accident. Rafiki drove his tractor trailer for Runa over the center line and struck two motorcycles (collectively, the "Accident"). A dashcam video of the Accident shows Rafiki's truck drove directly into the motorcycles driven by Gebo, Taylor and Hart and the death and carnage that resulted.

40. At the time of the Accident, Rafiki's driver medical certification had expired, because he did not submit updated medical certificate information. Rafiki pleaded guilty to reckless driving and was sentenced to 4-10 years in Nevada state prison.

41. The Accident was a covered claim under the Policy between NSIC and the Policyholder, Pan American. Sage, Runa, Rafiki, and Pan American were all qualified as insured parties under the Policy (collectively, the "Insureds"). At all relevant times, Sedgwick was to act as a third-party claims administrator for the Accident – as it was a valid and qualified claim under the Policy.

42. On or about March 25, 2024, the Accident was first reported to Sedgwick.

43. On or about March 29, 2024, Sedgwick notified AIPSO's counsel of the Accident.

44. On or about April 5, 2024, Sedgwick received a letter of representation from Hart's counsel.

45. On or about April 16, 2024, Sedgwick received a letter of representation from Taylor's counsel.

9

46. On or about April 16, 2024, Sedgwick forwarded a copy of its claim file to defense counsel.

47. On or about April 16, 2024, after a review of the horrific facts surrounding the Accident, Sedgwick appointed defense counsel for Pan American and gave her the authority to settle any claims arising therefrom for policy limits.

48. On or about May 1, 2024, Sedgwick received a letter of representation from Gebo's counsel.

49. On or around June 12, 2024, defense counsel for Pan American advised Sedgwick that she could not represent Rafiki due to a conflict of interest and recommended that Sedgwick hire insurance coverage counsel for itself and separate defense counsel for Rafiki. At this point, Rafiki did not have counsel representing him.

50. On or around October 9, 2024, the estate and next of kin of Taylor filed a wrongful death lawsuit in the 8th Judicial Circuit, Clark County, Nevada, Case No: A-24-903521-C, in a case styled *Taylor et al. v. Sage Freight, LLC et al.,* against the Insureds and the Nevada Department of Transportation ("NV DOT").

51. On November 12, 2024, Pan American answered the *Taylor* complaint and filed crossclaims against the other named Defendants, Sage, Runa, Rafiki and NV DOT.

52. On or around December 3, 2024, Sage tendered its defense to Sedgwick's counsel on the Taylor case stating that it was an additional insured on the Policy. Sedgwick did not immediately forward this tender to AIPSO, nor appoint defense counsel for Sage. As a result, Sage retained its own defense counsel.

53. On or around January 31, 2025, the estate of Gebo filed suit in the 8th Judicial Circuit, Clark County, Nevada, Case No: A-25-909608-C in a wrongful death lawsuit styled

*Donnalyn Vanorman-Wasano, as the special administrator of The Estate of Jeremy George Gebo, et al., vs. The State Of Nevada ex rel, The Nevada Department of Transportation*, against the Insureds and the NV DOT.

54. On or around February 12, 2025, the estate of Hart filed suit in the 8th Judicial Circuit, Clark County, Nevada, Case No: A-25-912500-C in a wrongful death lawsuit styled *Hart et. al v. Pan American Cargo, LLC et. al.,* against the Insureds and the NV DOT.

55. On March 27, 2025, counsel for Runa and Rafiki also tendered their defense in the case to Sedgwick stating they also were additional Insureds on the Policy. Sedgwick did not immediately accept that tender or provide counsel's letter to AIPSO, and Sedgwick only accepted Runa and Rafiki's tender in late May 2025, after AIPSO directed it to do so.

56. From June 2024 through December 19, 2024, Sedgwick's own claim records show that it was completely silent and sat idle during this period regarding the cases filed by the Nevada Plaintiffs. Sedgwick did not attempt to investigate whether the other defendants in the Taylor case were insured under the Policy, monitor the cases, communicate critical details to AIPSO, or otherwise adhere to its contractual duties as AIPSO's TPA under the Agreement.

57. Sedgwick's own claim files show that the adjuster who was initially assigned to the Nevada Plaintiffs' case on or about April 1, 2024, left the company. Then, another adjuster was assigned to the case but took no action and had no communications with defense counsel or AIPSO for approximately six months. Sedgwick failed to implement any supervisory oversight or quality control measures during this transition, in violation of its obligations under the Agreement.

58. It was only on or around January 20, 2025, after the file was transferred to yet another adjuster, that Sedgwick sent a "Notice of Handling" request to appointed defense counsel for Pan American, asking for a case evaluation report and budget. This request came more than

nine (9) months after Sedgwick was first notified of the Accident, demonstrating Sedgwick's systematic failure to properly administer the claim.

59. In fact, Pan American's appointed defense counsel was attempting to communicate with Sedgwick about the claim for over six months but never heard back.

60. On or around January 31, 2025, Pan American's defense counsel forwarded a limits demand from the Nevada Plaintiffs' attorneys to Sedgwick which in turn emailed the demand to AIPSO. The demand was for $1 million in exchange for a complete release of Pan American only (but not the other Insureds) from all three wrongful death cases. Critically, this demand explicitly excluded Sage, Runa, and Rafiki from the release, creating a conflict of interest among the Insureds that Sedgwick failed to recognize or address.

**F. Sedgwick's Negligent Conduct and Willful Misconduct as the Third-Party Claims Administrator for Claims Arising Out of the Accident**

**i. Sedgwick's Failure to Appoint Defense Counsel to Represent the Additional Insureds (Sage, Runa and Rafiki)**

61. While Sedgwick notified AIPSO about the Accident on March 25, 2024, Sedgwick's own case files show that Sedgwick failed to keep AIPSO advised of: (1) the severity of the claims; (2) Sedgwick's authorization to Pan American's defense counsel to settle the claims against Pan American for the $1 million in policy limits; (3) the conflicts of interest between the Defendants; or (4) the fact that Sage, Runa, and Rafiki were all additional Insureds on the Policy. Each of these failures constituted a separate breach of Sedgwick's duties under the Agreement.

62. For example, on or around December 3, 2024, Sage tendered its defense to Sedgwick's counsel for the first case filed by the Nevada Plaintiffs. Instead of appointing defense counsel to represent Sage, Sedgwick went silent, ignored Sage's tender of defense for several

months and only acknowledged Sage as an additional insured on the Policy months later in March 2025 after AIPSO directed it to do so.

63.     Sedgwick also failed to appoint defense counsel for Runa and Rafiki. As mentioned above, on March 27, 2025, counsel for Runa and Rafiki tendered their defense to Sedgwick. Sedgwick did not immediately accept that tender even though, like Sage, they were also claiming to be additional Insureds on the Policy.

64.     It was not until the end of April 2025 that Sedgwick informed AIPSO of the tenders made on it by Sage, Runa and Rafiki and of their claims as additional Insureds under the Policy.

65.     Sedgwick's failure to timely accept a tender of defense forced Runa and Rafiki to hire their own counsel to vacate defaults against them in the *Taylor, Hart,* and *Gebo* cases. This led to additional costs, fees, and expenses that could have been avoided but for Sedgwick's improper handling of the claims arising out of the Accident.

66.     Sedgwick's failure to appoint defense counsel was neglectful, irresponsible, and in breach of its contractually owed upon duties as a third-party administrator duties under the Agreement.  Ex. 1 § 1(A)(7)-(8).

67.     In addition to breaching the Agreement, Sedgwick did not even adhere to its own Guidelines or AIPSO's Guidelines.  Among other things, Sedgwick failed to create an action plan once it was notified of the Accident and failed to conduct an ongoing review of the plan throughout the life of the claim as required by Sedgwick's Guidelines.  Ex. 2, pg. 3.  For over six (6) months, Sedgwick failed to review its ongoing plan that was required to be reviewed at least every ninety days.  *Id.*

68.     Further, Sedgwick ***did not*** promptly notify AIPSO of the Accident or that it had resulted in fatalities.  Ex. 2, p. 9; Ex. 3, p. 3.  Sedgwick was notified of the Accident on March 25,

2024.  Contractually, Sedgwick was required to contact AIPSO regarding the Accident by the next business day, March 26, 2024.  *Id.*  It was not until March 29, 2024 – four (4) business days later – that Sedgwick informed AIPSO about the Accident.

69.     One of Sedgwick's duties was to assign defense counsel to handle the claims arising out of the Accident and to form a "partnership" with defense counsel to efficiently and effectively protect AIPSO, NSIC, Pan American and any other Insureds under the Policy.  Ex 2, p. 12.  That is far from what actually happened.

70.     Sedgwick went silent on defense counsel for over six (6) months and failed to even respond to defense counsel's various attempts to communicate with Sedgwick.

71.     Sedgwick was also obligated to seek authority from AIPSO on settlement offers.  Ex. 2, pg. 12; Ex. 3, pg. 9.  Sedgwick failed to obtain approval from AIPSO for the settlement offer from Pan American to counsel for the Nevada Plaintiffs which, as detailed below, exhausted the Policy coverage and left three Insureds under the Policy without any liability coverage.

72.     Sedgwick's actions are in opposition to its own Guidelines and AIPSO's Guidelines – both of which were incorporated into the Agreement.  Sedgwick breached its duties under the Agreement by failing to exercise reasonable care in reviewing and administering the Nevada Plaintiffs' claims against the Insureds.

### ii. Sedgwick Accepted an Exhaustive Limits Demand for Only One Insured

73.     To exacerbate the situation, on February 28, 2025, Pan American – through defense counsel appointed by Sedgwick – accepted a $1 million limits demand made by Plaintiffs on Pan American.  While AIPSO was informed of the demand, it never authorized the use of the $1 million limits of the Policy to resolve only the claims against one of its Insureds.

74. When it learned of the settlement and of the existence of other Insureds not covered by it, AIPSO refused to fund the Pan American settlement and directed Sedgwick to appoint independent counsel to represent Sage, Runa and Rafiki.

75. After agreeing to the $1 million dollar settlement authorized by Sedgwick, Counsel for Pan American tried to obtain the consent of the Nevada Plaintiffs' counsel to include Sage, Runa, and Rafiki in the releases, but, not surprisingly, counsel refused, pointing to his January 29, 2025 demand on Pan American alone and defense counsel's one-line acceptance of that demand for Pan American on February 28, 2025.

76. On April 30, 2025, the *Taylor* Court held a hearing on Pan American's Motion for a Good Faith Settlement Finding ("Pan American's Motion"). The Nevada Plaintiffs' counsel confirmed that he had settled with only one of five named Defendants (Pan American) and that the Nevada Plaintiffs' cases against the remaining Defendants were worth more than $50 million. Given that the settlement between the Nevada Plaintiffs and Pan American would exhaust the $1 million in Policy limits if approved, the Court denied Pan American's Motion.

77. The Nevada Plaintiffs' counsel responded by accusing Pan American of breaching its agreement to settle and AIPSO, NSIC and Sedgwick of engaging in bad faith insurance by: (1) not paying out on the Pan American settlement; and (2) favoring one of its Insureds (Pan American) over the others (Sage, Runa and Rafiki). On May 27, 2025, The Nevada Plaintiffs filed a Motion to Enforce the $1 million settlement they had reached with Pan American.

78. Sedgwick's authorization of the $1 million settlement between Pan American and Plaintiffs left Sage, Runa and Rafiki with no liability insurance while facing three wrongful death claims worth tens of millions of dollars each. Not surprisingly, they each explored the possibility

15

of filing for bankruptcy or taking other steps to immunize themselves from liability and huge jury verdicts, including assigning their rights under the Policy to the Nevada Plaintiffs.

79. Sedgwick's actions in approving the Pan American settlement left the remaining Insureds high and dry, with no liability coverage under the Policy, as a result of its effort to settle the Nevada Plaintiffs' claims against Pan American.

### G. AIPSO's Attempt to Limit its Insureds' Damages and Exposure

80. On June 10, 2025, AIPSO – in an attempt to protect Sage, Runa, and Rafiki from the settlement agreement they were excluded from – filed an interpleader complaint in Clark County, Nevada styled *National Specialty Insurance Company v. Sage Freight, LLC., et. al.,* Case No. A-25-920842-C. This way, a court would decide how to allocate the $1 million in Policy limits among every insured – not just the Policyholder Pan American.

81. AIPSO also hired independent counsel to defend Sage, Runa and Rafiki in each of the Nevada Plaintiffs' cases and hired special counsel to ensure that AIPSO, NSIC and Sedgwick were not found liable for engaging in bad faith insurance.

82. On or about June 6, 2025, the Nevada Plaintiffs' counsel wrote to AIPSO stating that counsel appointed to represent the Insureds was conflicted, that the limits of the Policy had been "uncapped" by Sedgwick's actions, and that Runa and Rafiki planned to assign their bad faith and contractual rights under the Policy to the Nevada Plaintiffs in return for covenants that the Nevada Plaintiffs do not enforce any judgment in the three cases against them.

83. AIPSO discovered that the Nevada Plaintiffs scheduled a global mediation on June 18, 2025 for all parties, including the Defendants and Sedgwick; yet, despite its relationship with AIPSO, Sedgwick did not secure an invitation for AIPSO to attend and participate in the mediation.

16

84.     To protects its Insureds from a payout exceeding the policy limits, bankruptcy and massive jury verdicts, AIPSO invited itself to the global mediation in an effort to settle in good faith all claims the Nevada Plaintiffs had asserted against Pan American, Sage, Runa, and Rafiki and all crossclaims that could be or already had been asserted against each other.

85.     At the mediation, the Nevada Plaintiffs demanded in excess of $100 million from Sage, Runa, and Rafiki with an assignment by those parties of their rights under the Policy against AIPSO, NSIC, and Sedgwick.

86.     After weeks of back-and-forth negotiations and using the mediation services of a former Nevada state court judge, the Nevada Plaintiffs, AIPSO, and defense counsel for Pan American, Sage, Runa, and Rafiki ultimately agreed that AIPSO would pay the Nevada Plaintiffs $18.5 million in exchange for the dismissal with prejudice of all claims that the Nevada Plaintiffs had asserted against Sage, Runa, and Rafiki and all claims any one of them could assert against AIPSO, NSIC, and Sedgwick (the "Global Settlement").

87.     The Global Settlement amount of $18.5 million was in addition to the $1 million in policy limits that Sedgwick's assigned counsel accepted on behalf of Pan American and an additional amount was contributed by Sage's secondary carrier.

88.     AIPSO also agreed to pay for the defense fees and costs incurred by Sage, Runa, and Rafiki in the months before Sedgwick appointed independent defense counsel to represent each of them.

89.     On August 26, 2025, AIPSO issued a Notice of Demand for Indemnification pursuant to Section 7 of the Agreement on behalf of AIPSO and NSIC.  The Notice is attached hereto as Exhibit 4.  AIPSO outlined Sedgwick's negligent actions in administering the claims arising out of the Accident and demanded Sedgwick to indemnify AIPSO and NSIC for all

amounts it paid in excess of the policy limits, including all costs, fees, and expenses AIPSO and NSIC incurred in resolving this matter. *Id.*

90. On October 22, 2025, Sedgwick, through its counsel Winget, Spadafora, Schwartzberg, LLP, denied that Sedgwick was negligent in its administration of the claims arising out of the Accident and refused to provide the contractual indemnity which Sedgwick owed to AIPSO. The letter from Sedgwick's counsel is attached hereto as Exhibit 5.

91. In his letter, Sedgwick's counsel admitted that Sedgwick had the duty to: (1) appoint defense counsel not just for Pan American but for Rafiki (the driver); and (2) allocate the $1 million in limits between the claimants and the Insureds. *See* Ex. 5.

92. The claims asserted against AIPSO and NSIC in the underlying litigation stem directly from Sedgwick's negligence and willful misconduct in administering the claims. As a direct consequence, AIPSO has sustained damages in excess of $18.5 million.

93. Pursuant to Section 7 of the Agreement between Sedgwick and AIPSO, Sedgwick is contractually obligated to indemnify AIPSO – and its agent NSIC – for all damages, costs, expenses, and attorney's fees it has sustained in settling the Nevada Plaintiffs' claims and in connection with Sedgwick's negligent performance and breaches under the Agreement. *See* Ex. 1 § 7(A).

## CLAIMS

### COUNT I – BREACH OF CONTRACT
### (CLAIMS ADMINISTRATION DUTIES)

94. AIPSO incorporates by reference and thereby re-alleges the foregoing paragraphs as is fully set forth herein.

95. The Agreement entered into between AIPSO and Sedgwick created a valid, binding, and enforceable contract.

96. The Agreement required Sedgwick to administer qualified claims with reasonable care and in accordance with: (a) the Agreement's express requirements; (b) applicable statutory and administrative requirements; and (c) the claims-handling standards and guidelines incorporated into the Agreement, including Sedgwick's Auto Service Expectations ("Sedgwick's Guidelines') and AIPSO's claims guidelines ("AIPSO's Guidelines").

97. Among other obligations, the Agreement required Sedgwick to timely respond to tenders of defense, timely assign defense counsel as appropriate, timely monitor and manage litigation activity, timely communicate material developments and excess-exposure information to AIPSO, and obtain AIPSO's authorization/approval where required for settlement activity and related claims decisions.

98. At all relevant times, AIPSO has fulfilled its obligations under the Agreement.

99. On the other hand, Sedgwick materially breached the Agreement by failing to use reasonable care in its third-party administration of the Nevada Plaintiffs' claims under the Policy.

100. Specifically, Sedgwick breached the Agreement by failing to process the Nevada Plaintiffs' claims under all applicable statutory and administrative regulations as well as Sedgwick and AIPSO's respective claims administration guidelines.

101. Sedgwick further breached the Agreement by: (a) failing to timely acknowledge and/or accept tenders of defense on behalf of Insureds and additional insureds entitled to a defense under the applicable policy and the claims program administered by Sedgwick; (b) failing to timely appoint and manage competent and independent defense counsel for all Insureds and additional insureds for whom a defense was required or reasonably necessary to protect the interests of AIPSO and the Insureds; (c) failing to timely and adequately investigate the claims; (d) failing to timely monitor, manage, and communicate regarding litigation activity, including pleadings,

19

deadlines, defaults, and other events affecting the posture and value of the claims and litigation; (e) failing to attempt to settle each claim within policy limits when the opportunity existed; and (f) failing to allocate the $1 million policy limits appropriately among multiple insureds and claimants.

102. Sedgwick was also obligated to, but failed to: (a) adhere to the contractual requirement to follow incorporated guidelines and standards (including action planning, periodic review, and litigation-management practices); (b) notify AIPSO of the claims in a timely fashion when it became apparent or should have become apparent that the claims would likely exceed the Policy limits; and (c) seek prior approval from AIPSO before making or rejecting settlement offers that exceeded Sedgwick's delegated settlement authority under the Agreement; or (d) obtain required authorization or approval from AIPSO for settlement decisions and/or claims-handling decisions that exceeded Sedgwick's contractual authority or reasonably required AIPSO input.

103. As a direct and proximate result of Sedgwick's material breaches of the Agreement, negligence, and willful misconduct, AIPSO has suffered and continues to suffer direct and consequential damages in excess of $18.5 million. Sedgwick's breaches created or substantially increased risk of excess exposure, impaired the defense of the Insureds, and forced AIPSO to incur substantial defense costs and settlement payments to protect the Insureds and mitigate damages.

104. AIPSO's damages include, but are not limited to: (a) $18.5 million paid to achieve the Global Settlement; (b) more than $100,000.00 in attorney's fees and costs AIPSO expended on special coverage counsel to address and resolve the bad faith claims threatened by the Nevada Plaintiffs' counsel against AIPSO, NSIC, and Sedgwick, and to protect AIPSO's Insureds from excess judgments, potential bankruptcy, and financial ruin; (c) the reasonable attorney's fees and

court costs incurred in bringing this action as required by § 12 of the Agreement; and (d) pre-judgment and post-judgment interest as allowed by law.

## COUNT II – BREACH OF CONTRACT
### (FAILURE TO DEFEND, HOLD HARMLESS, AND INDEMNIFY)

105. AIPSO incorporates by reference and thereby re-alleges the foregoing paragraphs as is fully set forth herein.

106. The Agreement includes an indemnity and defense obligation requiring Sedgwick to indemnify, hold harmless, and defend AIPSO (and any covered indemnitees identified in the Agreement) from and against liabilities, loss, or damage arising out of Sedgwick's material breaches, negligence, or willful misconduct in connection with Sedgwick's performance under the Agreement.

107. The losses for which AIPSO seeks recovery in this action arise out of and were caused by Sedgwick's material breaches, negligence, and/or willful misconduct in connection with Sedgwick's performance of claims-administration services under the Agreement, including the failures described above.

108. AIPSO provided Sedgwick with notice and a demand for contractual indemnification and defense for the covered losses.

109. Sedgwick breached the Agreement by refusing and/or failing to provide the contractual indemnity, hold-harmless protection, and defense owed to AIPSO for losses arising from Sedgwick's breaches and negligent, and/or willful misconduct in performance of the Agreement.

110. Sedgwick's breach of its indemnity and defense obligations has caused AIPSO additional damages, including attorneys' fees and costs incurred to address threatened claims and exposures and to pursue enforcement of Sedgwick's contractual obligations.

21

111.  No exclusion, limitation, or carve-out in the Agreement bars Sedgwick's indemnity and defense obligations on these facts, because the acts and omissions causing AIPSO's losses were Sedgwick's own claims-handling and litigation-management failures.

112.  AIPSO is entitled to judgment against Sedgwick for all damages recoverable under the Agreement, including covered losses and amounts incurred as a result of Sedgwick's refusal to honor its indemnity and defense obligations, and its court costs and attorney's fees.

## COUNT III – DECLARATORY JUDGMENT
### (28 U.S.C. § 2201; Contractual Indemnity and Defense Obligations)

113.  AIPSO incorporates by reference and thereby re-alleges the foregoing paragraphs as is fully set forth herein.

114.  An actual, present, and justiciable controversy exists between AIPSO and Sedgwick concerning the parties' rights and obligations under the Agreement, including Sedgwick's obligations to indemnify, hold harmless, and defend AIPSO for losses arising out of Sedgwick's material breaches, negligence, and willful misconduct in connection with its performance under the Agreement.  Sedgwick has failed and refused to hold harmless, defend, and indemnify AIPSO for the losses incurred by it, including on the basis of purported limitations, exclusions, or carve-outs.

115.  AIPSO seeks a declaration that: (a) Sedgwick's material breaches, negligence, and/or willful misconduct in connection with its performance under the Agreement triggered Sedgwick's obligations under the Agreement's indemnity and defense provisions; (b) Sedgwick is obligated to indemnify AIPSO for the categories of loss alleged in this Complaint that were incurred as a result of Sedgwick's breaches and misconduct in performance; and (c) Sedgwick is obligated to defend AIPSO (to the extent the Agreement imposes a defense obligation) with respect

22

to covered claims, demands, and losses arising from Sedgwick's breaches, negligence, and willful misconduct in performance.

116. A declaratory judgment will clarify and settle the legal relations at issue and will afford relief from uncertainty and insecurity regarding Sedgwick's ongoing and disputed contractual obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff AIPSO respectfully requests that this Court enter judgment in its favor and against Defendant Sedgwick as follows:

A. Compensatory damages in an amount exceeding $18,500,000.00;

B. Pre-judgment interest on all amounts due from the date of each expenditure at the maximum rate allowed by Tennessee law;

C. Post-judgment interest at the rate provided by Tennessee law;

D. All reasonable attorney's fees and costs incurred in the underlying matter;

E. All reasonable attorney's fees and costs incurred in prosecuting this action, as provided by the Agreement § 12 and Tennessee law;

F. Such other and further relief as this Court deems just and proper.

23

Respectfully submitted,

*/s/ Thomas W. Shumate IV*

**THOMPSON BURTON, PLLC**

Thomas W. Shumate IV (#19595)
Katelyn B. Barham (#041434)
1801 West End Avenue, Suite 1550
Nashville, TN 37203
(615) 652-1107
tshumate@thompsonburton.com
kbarham@thompsonburton.com
*Local counsel for AIPSO*

**SAUL EWING, LLP**

James A. Morsch
Megan A. Manoj
161 North Clark, Suite 4200
Chicago, IL, 60601
Tel: (312) 876-7866
jim.morsch@saul.com
megan.manoj@saul.com

M. Paige Berry
650 College Road East, Suite 4000
Princeton, NJ 08540-6603
Tel: (609) 452-3138
paige.berry@saul.com
*Counsel for AIPSO*

*PENDING Motion to Admit Pro Hac Vice*

24